WO

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| Michael Wade Simmons, | No. CV-24-00055-TUC-AMM |
| Plaintiff, | **ORDER** |
| v. | |
| Auto-Owners Insurance Company, | |
| Defendant. | |

Pending before the Court is Defendant Auto-Owners Insurance Company's Motion for Partial Summary Judgment. (Doc. 50.) The matter is fully briefed. (Docs. 50–51, 54–55, 56.) The Court held oral argument on May 12, 2026. (Doc. 60.)

For the following reasons, the Court will grant the Motion for Partial Summary Judgment.

## I.      Procedural Background

Plaintiff Michael Wade Simmons brought this action in Pima County Superior Court on December 21, 2023 against Defendant Auto-Owners Insurance Company. (Doc. 1 at 1.) Defendant removed the case on February 1, 2024 based on diversity. (*Id.*)

Plaintiff brings two claims. (Doc. 1-3 at 5–8.) In Count I, Plaintiff alleges breach of contract because Defendant did not pay out $300,000 from his underinsured motorist ("UIM") policy after a rear-end collision that he claims resulted in injuries to his neck. (*Id.* at 5–6.) In Count II, Plaintiff alleges bad faith because Defendant "put their own interests ahead of their insured's by failing to promptly investigate, evaluate, and pay [Plaintiff's] claim without a reasonable basis." (*Id.* at 7.) Plaintiff seeks compensatory

damages, special damages for medical expenses and loss of income, and punitive damages for bad faith. (*Id.*)

## II.    Relevant Facts

On September 24, 2021, Plaintiff Michael Wade Simmons was rear-ended by non-party Daniel Navarro Dominguez. (Doc. 51 at 3; Doc. 55 at 1.) At the scene, Plaintiff told the investigating officer "he was uninjured." (Doc. 51 at 3; Doc. 55 at 1.) The investigating officers reported the accident as a "non-injury collision." (Doc. 51 at 3; Doc. 55 at 2.) Both vehicles were operable and driven from the scene by their owners. (Doc. 51 at 3; Doc. 55 at 2.)

Defendant insured Plaintiff under a commercial auto policy with UIM coverage limits of $300,000 per person or $300,000 per accident to cover "damages . . . result[ing] from bodily injury sustained by the insured caused by the accident." (Doc. 51 at 3, 22; Doc. 55 at 2.) The policy required Plaintiff's cooperation in any claim investigation, including providing authorizations to access medical records, participating in medical examinations, and agreeing to an examination under oath ("EUO"). (Doc. 51 at 3; Doc. 55 at 2.)

On September 29, 2021, Plaintiff's counsel sent Defendant a letter notifying Defendant of the accident. (Doc. 51 at 3; Doc. 55 at 2.) Plaintiff's counsel called Defendant that same day asking Defendant "not to open up UIM exposure yet." (Doc. 51 at 3; Doc. 55 at 2.) Plaintiff's counsel asked for a copy of the policy's declaration page, and Defendant mailed the copy to Plaintiff's counsel the following day. (Doc. 51 at 4; Doc. 55 at 2.)

On June 13, 2022, Plaintiff's counsel provided Defendant with a notice of a UIM claim and stated that a demand would soon follow. (Doc. 51 at 4; Doc. 55 at 2.)

On June 14, 2022, Plaintiff's counsel sent a letter to Defendant stating that the at-fault driver's insurance paid the $25,000 policy limit, and Plaintiff demanded "his UIM policy limit of $300,000.00 to resolve the matter." (Doc. 51 at 4; Doc. 55 at 2.) The demand letter informed Defendant that Plaintiff is a construction worker and that he incurred expenses after being treated for pain in his neck, right shoulder, and back that he

began experiencing after the rear-end collision. (Doc. 51 at 4; Doc. 55 at 2.) The letter listed past medical expenses including more than $66,000 for imaging and steroid injections. (Doc. 51 at 4; Doc. 55 at 2.) It also detailed anticipated future medical expenses of approximately $190,000 for anterior cervical surgery. (Doc. 51 at 4; Doc. 55 at 2.) With the letter, Plaintiff included records of chiropractic visits shortly after the accident at which Plaintiff complained of pain and a record of an MRI taken two weeks after the accident. (Doc. 55 at 3–4.)

On July 6, 2022, Khavari "determined there was insufficient information to pay the claim." (*Id.* at 43.) He assigned Auto Claims Adjuster Paul Steffensen to conduct further investigation. (*Id.* at 43, 55.)

On July 7, 2022, Steffensen emailed Plaintiff's counsel requesting accident photos and Plaintiff's medical records for the past five years. (Doc. 51 at 4–5; Doc. 55 at 5.) In response, Plaintiff's counsel provided a property repair estimate showing $6,375 in damage. (Doc. 51 at 5; Doc. 55 at 5.) He did not otherwise respond to Steffensen's request.

On July 13, 2022, Defendant sent another letter to Plaintiff's counsel to renew its request for photos from the accident and Plaintiff's medical records for the past five years. (Doc. 51 at 5; Doc. 55 at 5.) Defendant notified Plaintiff that "in the absence of the information we have requested, we cannot make an offer at this time." (Doc. 51 at 5; Doc. 55 at 5.)

On July 14, 2022, Defendant called Plaintiff's counsel to follow up on its letter. (Doc. 51 at 5; Doc. 55 at 5.) During this call, Defendant also asked Plaintiff's counsel if Defendant could take a recorded statement of Plaintiff. (Doc. 51 at 5; Doc. 55 at 5.) There is no indication how Plaintiff's counsel responded on the phone.

Later that day, Plaintiff's counsel sent a letter to Defendant refusing a recorded statement and denying having any accident photos. (Doc. 51 at 5; Doc. 55 at 5.) Plaintiff's counsel also wrote: "Please note, your insured has no medical records for injuries in the last five (5) year[s] and therefore there is nothing to produce." (Doc. 51 at

- 3 -

86.) Plaintiff's counsel did not say whether Plaintiff had non-injury medical records from the past five years, which Defendant believed were nonetheless relevant to investigating the claim. (Doc. 56 at 6.)

On July 15, 2022, Steffensen spoke with Plaintiff informally. (Doc. 51 at 5, 51–52, 69–70; Doc. 55 at 5.) Steffensen wrote in his notes that Plaintiff "was very forthright to any questions [he] brought forward." (Doc. 51 at 51.) According to Steffensen, Plaintiff described himself as a "workaholic" who had not missed any work up to that point. (*Id.* at 51–52.) He told Steffensen that "[h]e first felt the injuries from the accident the night that they occurred," and Steffensen recorded that statement in his notes in the claim file. (*Id.* at 52.) He reported some improvement in symptoms but said that he experienced stiffness and headaches and believed he would need neck surgery. (*Id.* at 52, 69; Doc. 55 at 5–6.) Later that day, Steffensen emailed Plaintiff's counsel explaining that Plaintiff had to appear for an independent medical examination ("IME") and an EUO because there was not enough information to pay for surgery.[1] (Doc. 51 at 5, 69–70.)

On July 16, 2022, Steffensen made a note in the claim file that said there was not enough information to offer payment, specifically because Steffensen was not sure that surgery was reasonable or necessary. (Doc. 51 at 6, 51.) Steffensen noted that more investigation was needed, including an IME and EUO. (*Id.* at 51.)

On July 19, 2022, Steffensen instructed Chandelle Yi, a registered nurse working for the company, to review Plaintiff's medical records to determine whether his past and future treatment was reasonable. (*Id.* at 6, 50.) Nurse Yi opined that the epidural injections Plaintiff received were "an overutilization of healthcare services" and were not necessary "to treat any traumatic injuries to his cervical spine as a result of the [motor vehicle accident] of 9/24/2021." (*Id.* at 50.) Nurse Yi further opined that, based on the medical records, Plaintiff had not suffered any traumatic injuries as a result of this accident. (*Id.*) Nurse Yi recorded her findings in an entry to the claim file. (*Id.*)

---

[1] The email is not in evidence, and Plaintiff contests its existence. (Doc. 55 at 6.) However, Steffensen's sworn declaration states that he sent the email and communicated the described information. (Doc. 51 at 69.) Steffensen's note in the file supports his declaration. (*Id.* at 51.)

On July 26, 2022, Steffensen wrote in the claim file that an IME and EUO were "a must" to proceed with the claim. (*Id.* at 49.) He described inconsistencies between Plaintiff failing to report any injuries at the scene of the accident and subsequently visiting a chiropractor 19 times and undergoing an MRI. (*Id.*) Steffensen reasoned that Plaintiff's pain was more likely a result of a chronic degenerative disease rather than the impact of the accident. (*Id.*)

Defendant asserts that it never received a response to its July 15, 2022 email requesting an IME and EUO. (*Id.* at 7.) Plaintiff contests ever receiving this email.[2] (Doc. 55 at 7.) In any event, on July 29, 2022, Steffensen sent another email to Plaintiff's counsel requesting an IME and EUO. (Doc. 51 at 7.)

Plaintiff's counsel did not respond. (*Id.*; Doc. 55 at 7.) Instead, Plaintiff's counsel submitted a renewed demand letter for Plaintiff's policy limit on August 22, 2022. (Doc. 51 at 7; Doc. 55 at 7.) Defendant then retained counsel. (Doc. 51 at 7; Doc. 55 at 7.)

On August 25, 2022, Defendant's counsel responded to Plaintiff's renewed demand letter explaining that Defendant cannot pay the claim without further information. (Doc. 51 at 7; Doc. 55 at 7.) Defendant's counsel further wrote to Plaintiff: "It is our understanding Auto-Owners' requests of July 7, July 8, July 13 and July 14, 2022 for 5 years of prior medical records and Auto-Owners['] requests of July 15 and July 29, 2022 for an independent medical examination and examination under oath have been refused." (Doc. 51 at 7.)

On October 7, 2022, Plaintiff's counsel responded by providing signed medical authorizations allowing Defendant to access Plaintiff's medical records from before 2016.[3] (*Id.* at 7; Doc. 55 at 8.) Plaintiff's counsel also emailed Defendant medical records from Plaintiff's 2015 car accident. (Doc. 51 at 8; Doc. 55 at 8.)

---

[2] The email is not in evidence, and Plaintiff contests its existence. (Doc. 55 at 6.) However, Steffensen's sworn declaration states that he sent the email and communicated the described information. (Doc. 51 at 69.) Steffensen's note in the file supports his declaration. (*Id.* at 51.)

[3] The Court notes that these records would not have been disclosed in response to Defendant's request for the previous five years of records. At the oral argument, Plaintiff maintained that he did not have any medical treatment in the five years preceding the accident in 2021.

Thereafter, Defendant again requested an IME and EUO. (Doc. 51 at 8; Doc. 55 at 8.) The parties coordinated and conducted an EUO and an IME on March 7, 2023. (Doc. 51 at 8; Doc. 55 at 8.) In his EUO, Plaintiff testified he missed approximately three cumulative weeks of work due to the accident and described prior accidents in 1995 and 2015. (Doc. 51 at 8; Doc. 55 at 8.)

Dr. Douglas P. Hartzler conducted the IME with Plaintiff. (Doc. 51 at 170.) After the examination, Dr. Hartzler concluded that Plaintiff "may have aggravated his pre-existing degenerative condition in the cervical spine" and "[t]here was no objective evidence that a new injury occurred to the right shoulder." (*Id.* at 8; Doc. 55 at 8.) Dr. Hartzler also opined that "[t]he medical records do not support a need for MRI evaluation with lack of documentation of failure of conservative treatment." (Doc. 51 at 8; Doc. 55 at 9.) He similarly concluded that the epidural injections Plaintiff received were unreasonably expensive and "did not address the area of pathology that [Plaintiff] may have been complaining of." (Doc. 51 at 8; Doc. 55 at 9.) Dr. Hartzler finally opined that "at this point in time[,] there is no need for future healthcare especially surgery." (Doc. 51 at 9; Doc. 55 at 9.)

On March 10, 2023, Plaintiff's counsel emailed Defendant a renewed demand for the policy limit. (Doc. 51 at 9; Doc. 55 at 9.) Defendant's counsel responded asking for "employment records to substantiate missed time from work first disclosed in Plaintiff's EUO; and medical records related to the prior auto accidents that Plaintiff described in his EUO." (Doc. 51 at 9; Doc. 55 at 9.) Defendant also requested more time to investigate the claim. (Doc. 51 at 9; Doc. 55 at 9.) Plaintiff's counsel did not respond to these requests. (Doc. 51 at 9; Doc. 55 at 9.)

On May 31, 2023, Plaintiff's counsel sent a final demand letter for the policy limit. (Doc. 51 at 9; Doc. 55 at 9.) There is no evidence of anything that occurred between the parties following this letter until Plaintiff's counsel filed the present lawsuit on December 21, 2023.

### III.    Motion for Partial Summary Judgment

Defendant moved for partial summary judgment as to Count II and as to punitive

damages.[4] (Doc. 50 at 14.) First, Defendant argues that it is entitled to summary judgment as to Count II because there is no evidence to support either the objective or the subjective prong of a claim of bad faith. (*Id.* at 8.) As to the objective prong, Defendant argues there is no evidence that it acted unreasonably in investigating, evaluating, and processing Plaintiff's insurance claim. (*Id.*) Defendant argues its investigation and responses were timely. (*Id.*) Defendant does not argue Plaintiff violated the cooperation clause of his insurance policy but argues that "Plaintiff persistently delayed providing information requested by [Defendant]."[5] (*Id.* at 10.) Similarly, as to the subjective prong, Defendant argues that even if it had acted unreasonably, there is no evidence that it did so knowingly or with reckless disregard. (*Id.* at 11.)

Second, Defendant argues that it is entitled to summary judgment as to the availability of punitive damages. (*Id.* at 13.) Defendant asserts that no reasonable jury could find the requisite "evil hand" by clear and convincing evidence. (*Id.*)

Plaintiff opposes the motion because there are disputed questions of fact for a jury as to both the bad faith claim and punitive damages. (Doc. 54 at 1.) Plaintiff argues that a reasonable jury could find that Defendant's actions were objectively unreasonable by failing to give Plaintiff "equal consideration." (*Id.* at 11.) Plaintiff states that he provided extensive evidence that he suffered at least an aggravation of a degenerative condition in his cervical spine but "Defendant, as of the filing of the present lawsuit, had never evaluated or processed Plaintiff's claim." (*Id.* at 13–14.) In other words, Plaintiff argues he was "force[d] . . . to go through needless adversarial hoops in order to have the claim adjudicated." (*Id.* at 14.)

As to the subjective prong of a bad faith claim, Plaintiff argues that a reasonable jury could find that Defendant's actions were so reckless that it should have known it was acting unreasonably. (*Id.* at 15.) Specifically, Plaintiff highlights that Defendant was aware that "Plaintiff did not seek immediate medical treatment [after the accident]

---

[4] Defendant agrees that there is a triable issue as to whether the accident caused Plaintiff's injuries and does not seek summary judgment on Count I. (Doc. 56 at 5 n.3.)

[5] In its Reply, Defendant clarifies that it does not allege Plaintiff violated the cooperation clause. (Doc. 56 at 2.)

because he's 'stoic' or that he was uninsured and could not afford to go to the hospital." (*Id.* at 15–16.)

Plaintiff also argues that he "provided responses to requests promptly, attended the examination under oath ("EUO") and a medical examination upon request, and answered questions forthright and truthfully." (*Id.* at 11.)

Finally, Plaintiff asserts that the issue of punitive damages should be decided by a jury because there is evidence of an "evil hand." (*Id.* at 17.) He argues (1) "Defendant used its own nurse as a basis for not processing and paying Plaintiff's claim when Defendant's employees are provided a bonus when premiums exceed claim payouts," and (2) "Defendant's own adjuster felt Plaintiff was honest and defended the case as if everything Plaintiff said was dishonest." (*Id.*) If a jury agreed with either of these theories, Plaintiff posits, they could reasonably find that Plaintiff is entitled to punitive damages. (*Id.*)

Defendant disputes Plaintiff's characterization of the bonus program. (Doc. 56 at 10.) It contends that its bonus program did not apply to Steffensen and, even if it had, the program is based ultimately on the company's profitability, not "arbitrary claim payment goals . . . ." (*Id.*) Moreover, Defendant argues that nobody treated Plaintiff as dishonest in his belief that his pain was due to the accident; rather, Defendant and its decisionmakers simply disagreed that the injury was caused by the accident. (*Id.*)

## IV.    Standard of Review

The Court grants summary judgment if the pleadings and supporting documents, viewed in the light most favorable to the non-moving party, "show[] that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986) (quoting Fed. R. Civ. P. 56(a), (c)). An issue is genuine when a reasonable jury could resolve the disputed facts in favor of either party. *See Ellison v. Robertson*, 357 F.3d 1072, 1075 (9th Cir. 2004) (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 250–51 (1986)). A disputed fact is material if it "might affect the outcome of the suit under the governing law." *Anderson*, 477 U.S. at 248.

The moving party bears the initial burden of establishing there is no genuine issue of material fact. *Celotex Corp.*, 477 U.S. at 323. The burden then shifts to the non-movant to "come forward with 'specific facts showing that there is a genuine issue for trial.'" *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) (quoting Fed. R. Civ. P. 56(e)). The non-movant "must do more than simply show that there is some metaphysical doubt as to the material facts." *Id.* at 586–87. Likewise, the non-movant's bare assertions, standing alone, are insufficient to create a material issue of fact and defeat a motion for summary judgment. *Anderson*, 477 U.S. at 247–48. Thus, summary judgment is mandated "against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp.*, 477 U.S. at 322.

The Court's role at the summary judgment stage is to determine whether there is a genuine issue for trial. *See Anderson*, 477 U.S. at 249–50. "[T]here is no issue for trial unless there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party." *Id.* at 249 (citing *First Nat'l Bank of Ariz. v. Cities Serv. Co.*, 391 U.S. 253, 288–89 (1968)). "If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted." *Id*. at 249–50 (citations omitted).

V.    **Discussion**

**A.  Count II: Bad Faith**

"The tort of bad faith arises when the insurer 'intentionally denies, fails to process or pay a claim without a reasonable basis.'" *Zilisch v. State Farm Mut. Auto. Ins. Co.*, 995 P.2d 276, 279 (Ariz. 2000) (quoting *Noble v. Nat'l Am. Life Ins. Co.*, 624 P.2d 866, 868 (Ariz. 1981)). "The plaintiff must also show the insurer knew it was acting unreasonably or with reckless disregard of the lack of a reasonable basis for denying the claim." *Columbus Life Ins. Co. v. Wilmington Trust NA*, No. CV-21-00734-PHX-DJH, 2024 WL 4364130, at *3 (D. Ariz. Sept. 30, 2024) (citing *Noble*, 624 P.2d at 868).

Thus, the tort of bad faith against an insurer has two elements: (1) unreasonableness, and (2) knowledge or reckless disregard. *Zilisch*, 995 P.2d at 280; *Golden Rule Ins. Co. v. Montgomery*, 435 F. Supp. 2d 980, 995 (D. Ariz. 2006).

"The first element is clearly an objective test based upon a simple negligence standard: did the insurance company act in a manner consistent with the way a reasonable insurer would be expected to act under the circumstances." *Trus Joist Corp. v. Safeco Ins. Co. of Am.*, 735 P.2d 125, 134 (Ariz. Ct. App. 1986); *Golden Rule Ins. Co.*, 435 F. Supp. 2d at 995. "Where an insurer acts reasonably, there can be no bad faith." *Trus Joist Corp.*, 735 P.2d at 134.

"To determine whether the insurer's actions were reasonable, courts should examine the insurer's investigation and its evaluation and review of the investigative results." *Brown v. U.S. Fid. & Guar. Co.*, 977 P.2d 807, 815 (Ariz. Ct. App. 1998). "If the insurer conducted a reasonable investigation, it can safely and in good faith deny claims that are fairly debatable." *Id.* "Even if ultimately wrong, if a reasonable basis existed for denying the claim, the insurer cannot be liable for bad faith." *Aetna Cas. & Sur. Co. v. Superior Court In & For Cnty. of Maricopa*, 778 P.2d 1333, 1336 (Ariz. Ct. App. 1989).

Generally, an insurer's "belief in fair debatability 'is a question of fact to be determined by the jury.'" *Zilisch*, 995 P.2d at 279 (quoting *Sparks v. Rep. Nat'l Life Ins. Co.*, 647 P.2d 1127, 1137 (Ariz. 1982)). However, "there are times when the issue of bad faith is not a question appropriate for determination by the jury." *Aetna Cas. & Sur. Co.*, 778 P.2d at 1336 (upholding trial's court order of summary judgment in favor of insurer on bad faith claim because insurer had a "reasonable basis" to deny the claim and its investigation was adequate).

Furthermore, "[a]n insurance company's failure to adequately investigate only becomes material when a further investigation would have disclosed relevant facts." *Id.* Thus, a plaintiff must demonstrate what additional pertinent facts would have been determined by further investigation to establish that the insurer's pre-denial investigation could amount to bad faith. *See id.*; *Sobieski v. Am. Standard Ins. Co. of Wisconsin*, 382 P.3d 89, 92 (Ariz. Ct. App. 2016) (finding insurance company's investigation was unreasonable when claim investigator failed to contact four witnesses to the accident and failed to review the police report).

Here, Plaintiff fails to present any genuine dispute that Defendant's investigation was objectively unreasonable. Defendant promptly responded to the notice of the claim and reviewed the initial documents provided including the police report from the accident. Defendant then requested more information from Plaintiff including photos, repair estimates, and medical records. At this time, Defendant made clear to Plaintiff that it could not make an offer on his claim based on the information provided.

Over the course of the investigation that followed, Defendant repeated requests for information until they were complete. For example, Defendant asked for five years of prior medical records until it was made clear to Defendant that Plaintiff did not have *any* medical records during that timeframe.

In a further effort to corroborate Plaintiff's claim, Defendant had Nurse Yi conduct a review of Plaintiff's medical records. However, Defendant's investigation did not stop once Nurse Yi concluded that treatment was unnecessary. Defendant continued to investigate the claim. Defendant conducted an EUO to permit Plaintiff to offer a sworn statement regarding his symptoms and injuries. Defendant also conducted an IME to allow Dr. Hartzler to independently meet with and examine Plaintiff.

After Dr. Hartzler concluded that Plaintiff's course of treatment was not supported by his examination, Plaintiff sent a final demand letter to Defendant. Defendant again informed Plaintiff that it did not have enough information to decide the claim because Plaintiff did not provide sufficient evidence that his injuries related to the accident. Nonetheless, Defendant tried to continue the investigation. Defendant's counsel asked Plaintiff for employment records and additional medical records related to Plaintiff's prior accidents. Instead of providing the requested documents, Plaintiff's counsel stopped participating in the investigation and filed this action.

These undisputed facts show that Defendant conducted a reasonable investigation. It communicated regularly with Plaintiff at every stage of the investigation and informed Plaintiff that it could not make an offer to pay the claim based on the information it had. The fact that Defendant continued to try to corroborate Plaintiff's claim does not render the investigation unreasonable. Plaintiff likewise fails to demonstrate what additional

pertinent facts would have been uncovered by further investigation.

At oral argument, Plaintiff focused on Steffensen's alleged failure to directly inform Nurse Yi and Dr. Hartzler that Plaintiff told Steffensen he began experiencing pain on the night of the accident and that Steffensen found Plaintiff "very forthright to any questions [Steffensen] brought forward" during the informal conversation with Plaintiff. (Doc. 51 at 51.) Plaintiff argued that, without this relevant information, Nurse Yi and Dr. Hartzler could not reach adequate opinions, thereby rendering the investigation unreasonable.

The Court disagrees. Nurse Yi was tasked with reviewing medical records, and Dr. Hartzler was tasked with examining Plaintiff. It is undisputed that they did so. It is also undisputed that Steffensen recorded in the claim file that Plaintiff reported to him experiencing pain the night of the accident. Nurse Yi arguably had access to those notes considering she made notes of her own in the claim file. It is similarly undisputed that Dr. Hartzler independently met with and examined Plaintiff. At this time, Plaintiff could have directly informed Dr. Hartzler that he began experiencing pain the night of the accident. If Nurse Yi and Dr. Hartzler were nonetheless unaware that Plaintiff reported pain the night of the accident, and if that affects their opinions, that fact standing alone is insufficient to establish a material issue of fact giving rise to a claim of bad faith. *E.g.*, *Sobieski*, 382 P.3d at 92 (it is unreasonable for a claim investigator to fail to review the police report and fail to contact four witnesses to the accident); *see also Anderson*, 477 U.S. at 249–50 ("If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted.") (citations omitted). Moreover, that question more likely relates to Plaintiff's claim for breach of contract, which is not at issue in this motion.

For these reasons, the Court finds that no reasonable juror could conclude from the undisputed facts that Defendant's investigation was objectively unreasonable. Because this is a threshold requirement for a claim of bad faith, the Court need not address the second element of whether Defendant acted with the requisite knowledge or reckless disregard. Accordingly, the Court will grant summary judgment in favor of Defendant as

to Count II of Plaintiff's Complaint alleging bad faith.

## B. Punitive Damages

An award of punitive damages is not a separate claim from the claim of bad faith. *Sisemore v. Farmers Ins. Co. of Ariz.*, 779 P.2d 1303, 1305 (Ariz. Ct. App. 1989). "Punitive damages may not be awarded unless it is first found that the insurance company acted in bad faith." *Id.* Because the Court finds that Defendant is entitled to summary judgment on Plaintiff's claim that Defendant acted in bad faith, Defendant is likewise entitled to summary judgment as to the availability of punitive damages for such a claim.

Moreover, even if the Court were to find that there is a triable issue as to whether Defendant acted in bad faith, Plaintiff has not presented sufficient evidence as to punitive damages. An award of punitive damages requires the plaintiff to offer clear and convincing proof "that defendant's evil hand was guided by an evil mind." *Nardelli v. Metro. Grp. Prop. & Cas. Ins. Co.*, 277 P.3d 789, 801 (Ariz. Ct. App. 2012) (quoting *Rawlings v. Apodaca*, 726 P.2d 565, 578 (Ariz. 1986)). Punitive damages in a bad faith action are appropriate "when, *and only when*, the facts establish that defendant's conduct was aggravated, outrageous, malicious or fraudulent." *Id.* (quoting *Rawlings*, 726 P.2d at 578). Such conduct exists, for example, where there is evidence that an insurance company set a "aggressive company-wide profit goal" and "tied the benefits of claims offices and individuals to, among other things, the average amount paid on claims . . . ." *Id.* at 802. On this type of record, "the jury could reasonably find the decisions [the insurance company] made in adjusting [plaintiffs'] claim . . . were driven by financial self interest and not by the merits of the [] claim or the terms of their [] policy, and therefore, [the insurance company] acted outrageously and with the requisite evil mind." *Id.*

Here, Plaintiff fails to provide any evidence that Defendant's actions were aggravated, outrageous, malicious, or fraudulent. To the extent that Plaintiff relies on an alleged predatory bonus scheme, Plaintiff fails to offer evidence that Steffensen or Nurse Yi—or any other decisionmaker in this investigation—was eligible for any such program. Plaintiff's mere assertions are not enough to survive summary judgment. *Anderson*, 477 U.S. at 249–50 ("If the evidence is merely colorable, or is not significantly probative,

summary judgment may be granted.).

## VI.  Conclusion

For the foregoing reasons,

**IT IS ORDERED** that Defendant's Motion for Partial Summary Judgment is **GRANTED**. (Doc. 50.) The only claim remaining in this case is Count I alleging breach of contract.

Dated this 14th day of May, 2026.

Honorable Angela M. Martinez
United States District Judge